

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*

August 12, 2016

**By ECF**

The Honorable William H. Pauley, III
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:   *United States* v. *Rowen Seibel*
            16 Cr. 279 (WHP)

Dear Judge Pauley:

      The Government respectfully submits this letter in advance of the sentencing of defendant Rowen Seibel (the "defendant" or "Seibel"), currently scheduled for August 19, 2016.

      The Parties have stipulated that based on his conduct, the defendant has a Sentencing Guideline range of just 12 to 18 months' imprisonment, PSR ¶ 3. As discussed below, the Government submits that a sentence within that Guidelines range is appropriate given the serious intentional and willful criminal conduct at issue and the need for specific and general deterrence.

## I.    The Offense Conduct

### A.    Obligations of United States Taxpayers With Respect to Foreign Financial Accounts

      Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("United States taxpayers") are

Honorable William H. Pauley, III
August 12, 2016
Page 2

obligated to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the Internal Revenue Service ("IRS"). On such return, United States taxpayers are obligated to report their income from any source, regardless of whether the source of their income is inside or outside the United States. In addition, on Schedule B of Form 1040, the filer must indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account." If the taxpayer answers that question in the affirmative, then the taxpayer must indicate the name of the particular country in which the account is located. July 14, 2016 Presentence Report ("PSR"), ¶ 5.

Separate and apart from the obligation to file Forms 1040, United States taxpayers who have a financial interest in, or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR"). PSR ¶ 6.

The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year. The FBAR requires that the filer identify the financial institution with which the financial account is held, the type of account (bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed. PSR ¶ 6.

### B.   UBS AG

UBS AG ("UBS") was a corporation organized under the laws of Switzerland. UBS, directly and through its subsidiaries, operated a global financial services business. Among other things, UBS provided banking, wealth management, and asset management services to United States taxpayers, including many, like the defendant, who lived in the Southern District of New York. PSR ¶ 7.

Beginning well before 2000 and continuing through at least 2009, UBS, through several of its employees, engaged in a scheme to assist United States

Honorable William H. Pauley, III
August 12, 2016
Page 3

taxpayers who had accounts at UBS in concealing the existence of UBS accounts, and the income earned in UBS accounts, from the IRS. PSR ¶ 8.

In February 2009, following a well-publicized investigation, UBS entered into a deferred-prosecution agreement with the Department of Justice, in which UBS admitted that it had helped its American clients evade their U.S. taxes and agreed to cooperate with the government's criminal investigations of many of those clients.

The next month, the IRS began a voluntary-disclosure program that allowed Americans with undisclosed offshore accounts to come forward and report themselves to the IRS. Participants in the program were required to (1) pay all the taxes they owed, plus interest; (2) pay a civil penalty based on the value of their undisclosed accounts; and (3) cooperate with the government's offshore-enforcement efforts by providing information about their banks and their bankers. In exchange, the IRS would agree not to refer the person to the Department of Justice for prosecution. A taxpayer was only eligible for the program, however, if they were not already under criminal investigation — the entire point of the program was to promote compliance among those whose criminal activity the government did not already know about. PSR ¶ 15.

### C.    Rowen Seibel's Numbered UBS Account

Five years before these revelations, however, on March 3, 2004, Rowen Seibel, the defendant, then just 23 years old and a recent graduate of the NYU Sloane School of Business, along with his mother, traveled to UBS offices overseas to execute UBS forms allowing Seibel to open and become the beneficiary and account holder of a UBS bank account titled not in his own name, but identified in internal bank records with the phrase "CQUE," followed by a unique account number (the "Numbered UBS Account"). PSR ¶ 9.

At that same time, Seibel's mother executed forms to have unlimited Power of Attorney over Seibel's Numbered UBS Account, Seibel executed a UBS Telefax Agreement, thereby allowing regular communication between Seibel and UBS via facsimile. Seibel also executed forms acknowledging that he was a

Honorable William H. Pauley, III
August 12, 2016
Page 4

United States citizen subject to United States taxation, and a form representing that Seibel was the beneficial owner of the assets and income stemming from the Numbered UBS Account. PSR ¶ 9.[1]

Finally, in exchange for the payment of an additional fee to UBS, Seibel authorized and directed UBS to retain all account correspondence so that no bank statements or other correspondence related to the Numbered UBS Account would be mailed to him in the United States, PSR ¶ 9, and thus risk exposure to the IRS by having monthly bank statements from a foreign bank be delivered by the United States Postal Service.[2]

When Seibel and his mother flew overseas to Switzerland to open up this Numbered UBS Account in March 2004, it was opened a $25,000 cash deposit from his mother. Between 2004 and 2005, His mother arranged for cash and checks totaling approximately $1,000,000 to be deposited into Seibel's UBS account, bringing to $1,011,279 the total deposits into that account.

---

[1]     The UBS account papers and the Voluntary Disclosure application (see discussion below) also signed by Seibel, each asserted Seibel was the beneficial owner of the funds which was consistent with what his mother told her attorney when the IRS contacted her in late 2008, *i.e.,* that she had wanted to start a "trust fund for the future benefit of her son, Rowen Seibel." Affidavit of Stuart A. Smith, ¶ 9 (Attached hereto at Exh. A  ("Exh. A,  Smith Aff.")).

[2]     The defense attempts to make the fact Seibel had no records here in the United States (having paid UBS extra to keep his account records in Switzerland), into grounds for mitigation by noting that instead of fighting the duly issued grand jury subpoena served upon his attorney Stuart A. Smith, Seibel complied and even sought "documents from UBS that were not in his possession." Rowen Seibel Aug. 5, 2016 Sentencing Memorandum, p. 36 ("Seibel Memo."closes).  That is hardly grounds *for mitigation;* moreover, it would have been contrary to the well-established case law for Seibel to contest the subpoena, *see, e.g., In Re: Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339, 350 (2d Cir. 2013) (rejecting efforts to not comply with a grand jury subpoena and characterizing the attempt to do so as "a feckless attempt to avoid paying lawfully-imposed taxes vital to the functioning of the United States").

Honorable William H. Pauley, III
August 12, 2016
Page 5

Although there is no evidence that Seibel made any of the deposits, the UBS bank records show that between 2004 and 2008, he was the one who actively monitored and approved the selection, and investment of, the assets maintained in the Numbered UBS Account.  That direct involvement in the trading in the account resulted in the production of a substantial amount of income in the form of capital gains, dividends and interest.  Indeed, in just a few years, there was by 2008, a high-water balance in the account of approximately $1,300,200. PSR ¶ 10.  For a recent business school graduate, this 28 percent increase in principal over such a short period was very impressive.

### D.   The Hurried Closing of the UBS Account and the New Swiss Bank Account Using a Panamanian Shell Company

On or about May 30, 2008, Seibel traveled back to Switzerland and informed UBS personnel that he wanted to close out his Numbered UBS Account, specifically mentioning that his concern had been engendered by press reports relating to UBS. Those press reports had revealed various investigations commenced by United States law enforcement of UBS's role in helping United States citizens to evade federal income taxes by, among other things, using undeclared foreign bank accounts at UBS. PSR ¶ 11.

In fact, beginning on May 7, 2008, there had been a series of news articles in the New York Times and the Wall Street Journal, which referenced the United States' actions against UBS and its bankers.  In particular, the articles stated that Bradley Birkenfeld, a UBS banker who had worked closely with Seibel's mother and was involved with the opening of the UBS account, had been indicted in the Southern District of Florida for conspiracy in helping a wealthy American Real Estate developer evade taxes. *See,* May 2008 News Articles (attached herein at Exh. B).[3]

---

[3]   In late 2008, when the IRS sought to interview Seibel's mother about the UBS banker Bradley Birkenfeld, his mother advised her attorney Stuart A. Smith, that she met Birkenfeld in 2004 to discuss setting up a "trust fund" for Seibel. Exh. A, Smith Aff. at ¶¶ 7-9.

Honorable William H. Pauley, III
August 12, 2016
Page 6

In late May of 2008, when Seibel travelled to Switzerland to close out his Numbered UBS Account, he came prepared, having arranged ahead of time to have a Panamanian shell company created in the name of Mirza International ("Mirza"), of which he made himself the beneficial owner. Moreover, after closing out his UBS account, Seibel caused another offshore account, albeit at a different Swiss bank, Banque J. Safra, to be opened.[4] However, this time, instead of having his own name associated with the account as it had been at UBS, he put this account in the name of this newly created Panamanian shell company, Mirza International. PSR ¶ 11.

This was a shrewd move by Seibel to avoid detection by US authorities. If, as happened with UBS according to the news articles at the time, *see, e.g.,* May 15, 2008 WSJ article, "U.S. to subpoena UBS for wealthy client names," included in Exh. B, a subpoena had been issued by the US Tax authorities to this new bank, Seibel's new Swiss bank account would not have been disclosed. This is because Seibel also had the foresight to have the account held, not in his own name (or his mother's), but in the name of the Panamanian Company, Mirza International, over which, Seibel had given himself the lone signatory authority. PSR ¶ 11. Shortly thereafter, Seibel caused a $900,000 check that had been issued in closing out his UBS Account, to be deposited into the Mirza account at Banque J. Safra. PSR ¶ 11.[5]

### E.   The Omissions and Falsity in Rowen Seibel's Tax Returns

On or about October 10, 2008, Seibel filed with the IRS a Form 1040 for calendar year 2007. On that return, which Seibel signed under penalty of perjury, he omitted any dividend, interest, and other income received by him in one or more bank, securities, and other financial accounts at UBS. Seibel also failed to report,

---

[4]      In closing the UBS account, Seibel informed UBS officials that he needed 155,000 in Euros, so that he could buy an expensive Patek watch for himself. UBS "3.2 Contacts" document provided by UBS pursuant to treaty, included herein at Exh. C.

[5]      Mirza International is not included in the PSR as one of Seibel's many companies. PSR ¶ 11.

Honorable William H. Pauley, III
August 12, 2016
Page 7

as required by law, on Schedule B of his 2007 Form 1040 that he had an interest in or a signature authority over a financial account in a foreign country.  Moreover, because of his signatory or other authority over the Numbered UBS Account, Seibel was required to file an FBAR for calendar year 2007, but he failed to do so. PSR ¶ 13.

On or about April 15, 2009, Seibel submitted an IRS Form 1040 for calendar year 2008.  On that return, Seibel omitted the dividend, interest, and other income received by him in one or more bank, securities, and other financial accounts at UBS.  Moreover, Seibel falsely claimed, on Schedule B attached to his 2008 Form 1040, that he did not have an interest in or a signature authority or control over a financial account in a foreign country.  In addition, because of his signatory authority over the Numbered UBS Account, Seibel was required to file an FBAR for calendar year 2008, but he failed to do so. PSR ¶ 14.

### F.    Rowen Seibel's Voluntary Disclosure Program Submission

Since 2009, the government's offshore bank account enforcement efforts have expanded well beyond UBS and Switzerland, and criminal prosecutions brought by the Department of Justice — as part of its "Offshore Compliance Initiative," spearheaded by the Tax Division — have resulted in more than one hundred account holder convictions.

These enforcement efforts play a critical role in upholding the rule of law.  As is emblazoned across the front of the IRS building in the Washington, D.C., "[t]axes are what we pay for civilized society," *Compania Gen. de Tabacos de Filipinas* v. *Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).  Yet, the integrity of our tax system depends on both the perception and the reality that the government will not take the hard-earned income of law-abiding taxpayers while letting those who knowingly and willfully decide to cheat on their taxes (or help others do so), get away with it.  Nowhere is this more important than in the area of offshore enforcement, where defendants, like Rowen Seibel, are typically wealthy and sophisticated.

Honorable William H. Pauley, III
August 12, 2016
Page 8

The Offshore Account Voluntary Disclosure Program ("Voluntary
Disclosure Program") was a program administered by the IRS that was intended to
allow U.S. taxpayers, *not already under investigation by the IRS*, to disclose their
previously undeclared offshore accounts and pay tax on the income earned in those
accounts. Under the Voluntary Disclosure Program, in order to avoid criminal
prosecution, participants paid tax on the unreported income, a twenty percent
accuracy penalty on the tax, and a twenty percent penalty on the high balance of
the undeclared account, together with interest, related to their failure to disclose
their accounts. The IRS announced the First Voluntary Disclosure Program on
March 23, 2009 and closed that program on October 15, 2009.

In the fall of 2009, however, because an attorney for Seibel's mother, Stuart
A. Smith ("Smith"), knew his mother was already under investigation by the IRS
when it had sought to interview her about her contacts with Bradley Birkenfeld
(the UBS banker mentioned in the news reports), the attorney advised her that she
did not qualify for the Voluntary Disclosure Program.  Instead, the attorney
suggested that Seibel make a submission. Exh. A, Smith Aff, ¶ 11. Thereafter, the
attorney drafted an application for the Voluntary Disclosure Program (based upon
information from Seibel's mother) which the attorney emailed to Seibel to print
out, sign and mail that same day to the IRS. *Id.* at ¶¶ 13-19.  Seibel received the
document, executed it, and mailed it to the IRS. PSR ¶ 16.

That October 15, 2009 Voluntary Disclosure Program Application, however,
falsely stated that although Seibel had been aware, during the years 2004 and 2005,
that his mother had made deposits into a UBS Account for his benefit, that he,
Seibel, had *been unaware*, until he made inquiries of UBS *in 2009*, of the status of
his account at UBS and had in fact over time reached "the conclusion that deposits
[into his UBS Account] had been stolen or otherwise disappeared." These
statements were false. This is so because Seibel was (a) at all times knowledgeable
about the Numbered UBS Account and had taken an active role in the oversight of,
and transactions in, that account; and (b) was aware as to the disposition of the
funds from that account, as Seibel had traveled to Switzerland just the year before
with the hastily obtained Panamanian shell company papers to close out the UBS

Honorable William H. Pauley, III
August 12, 2016
Page 9

account and open the new account at Banque J. Safra using the name of the
Panamanian shell company. PSR ¶¶ 11, 16.

## II.     The Appropriate Sentence

The Parties have stipulated that based on his conduct, the defendant's
Guidelines range is 12 to 18 months' imprisonment, PSR ¶ 3, and the Government
submits that a sentence within the agreed upon Guidelines range is appropriate
given the conduct at issue and the need for specific and general deterrence as
discussed below.

Section 3553(a) of Title 18 requires district courts to "impose a sentence
sufficient, but not greater than necessary, to comply with" four specific statutory
purposes: (1) retribution ("to reflect the seriousness of the offense, to promote
respect for the law, and to provide just punishment for the offense"); (2) deterrence
("to afford adequate deterrence to criminal conduct"); (3) incapacitation ("to
protect the public from further crimes of the defendant"); and (4) rehabilitation ("to
provide the defendant with needed educational or vocational training, medical care,
or other correctional treatment in the most effective manner").  *See Rit*a v. *United
States*, 551 U.S. 338, 348 (2007); *Gall* v. *United States*, 552 U.S. 38, 50 n.6
(2007).

In determining a sentence that complies with these four sentencing purposes,
a district court must consider various factors: the "nature and circumstances of the
offense and the history and characteristics of the defendant," the "kinds of
sentences available," the Sentencing Guidelines range and Sentencing
Commission's relevant policy statements, the "need to provide restitution to any
victims of the offense," and the "need to avoid unwarranted sentence disparities
among defendants with similar records who have been found guilty of similar
conduct." 18 U.S.C. § 3553(a)(1), (3)-(7).  And when considering all of these
factors, the Guidelines range "should be the starting point and the initial
benchmark." *Gall, a*t 552 U.S. at 49.

### A.     The Nature and Circumstances of the Offense

The defendant Rowen Seibel is charged with, and has pleaded guilty to a
Corrupt Endeavor to Obstruct and Impede the Due Administration of the Internal
Revenue Laws in violation of 26 U.S.C. § 7212(a).   As such, Seibel's allocution
was a sufficient admission to his crime and fully consistent with his demonstrating

Honorable William H. Pauley, III
August 12, 2016
Page 10

acceptance of responsibility in terms of calculating his guideline range. Nevertheless, for purposes of determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a)(1), (3)-(7), Seibel's full conduct as discussed above (and in the PSR) was in fact much broader than the narrowly tailored focus of his allocution:

> THE COURT:  Can you tell us, please, what it is you did that makes you guilty of Count One of the offense charged in the information before you that's marked as Court Exhibit 2?
>
> THE DEFENDANT:  On my IRS Form 1040 for the year 2008, where it asks "Did you have a financial interest in or signator authority over a financial account located in a foreign country?" I corruptly answered the question "No" when I knew that answer was incorrect.  At the time, I knew that my mother had placed her monies into a foreign account held under my name, with her having the power of attorney over the foreign account.  I did this in order to aid my mother in failing to make payments of taxes related to that account.  This was done in Manhattan, which is within the Southern District of New York.

*United States* v. *Seibel*, 16 Cr. 279 (WHP), Apr. 18, 2016 Tr. pp. 15-16.  Rather, the IRS's attempt to enforce the tax laws was obstructed by Seibel's full conduct, starting with his traveling to Switzerland in 2004 with his mother to open an account in his name, giving her authority over it so she could make deposits into it and keeping authority over the account himself.[6]  As such, his mother deposited more than a $1 million in just a two year period from 2004 – 2005.  The IRS investigation – ten years later – determined that these funds came from a friend of his mother who was under the belief that his mother was selling her merchandise in return these funds. By 2014, however, it was virtually impossible for the Government to prove (or disprove) whether the $1 million had been income to his mother.  As such, the stipulated tax loss in this case, $53,685, was calculated only

---

[6]     Seibel's memorandum characterizes his account as "under [his mother's] complete control," Seibel Memo., p. 5, yet the only evidence of his mother's significant involvement was to deposit more than $1 million into the account for his benefit.  He was the one monitoring it, tweaking its investments, and more importantly, as described below, closed the account and moved the money into another account over which he had sole control.

Honorable William H. Pauley, III
August 12, 2016
Page 11

upon the tax due and owing for the amount of the account *earnings* that had accrued under Seibel's supervision. PSR ¶ 10.

Moreover, Seibel's failure to repatriate the funds back to the United States in 2008, and deciding instead to move the funds into an even less traceable bank account by using the Panamanian shell company, further obstructed the IRS from determining who owned and controlled that account, as well as whether the $900,000 from UBS in 2008 had generated taxable income in the years after 2008.

### B. Specific Deterrence

According to the United States Sentencing Commission statistics, the mean and median age of the 561 defendants sentenced for tax offenses in Fiscal Year 2015, was 50 years old. *See* Table 6, "Age of Offenders in Each Primary Offense Category Fiscal Year 2015," included herein at Exh. D (hereinafter, "Table 6"). As such, Seibel's young age at the time of this offense, 23 in 2004, and 28 in 2009, and now, just 34, is a critical factor for this Court to consider in imposing sentence.

Moreover, Seibel's young age stands in stark contrast to the typically elderly ages of others prosecuted for their conduct related to overseas bank accounts.[8] As such, the Government has rarely, if ever, in these series of overseas bank account cases raised the issue of specific deterrence. As discussed below, however, it is appropriate to do so with respect to Rowen Seibel who at 34, has shown himself capable of generating millions of dollars in income and has a lifetime of such earnings ahead of him.

At just 23 when his participation in this sophisticated crime started, Rowen Seibel was less *than half the average age* of those sentenced for tax crimes in 2015. The defendant's age at the time he committed these offense weighs in favor of a period of incarceration. The reason tax offenders have such an older mean and

---

[8]      For example, Seibel's memorandum mentions *United States* v. *Curran*, which he claims involved a defendant similarly situated to him because that defendant had not made the deposits into her foreign bank, having just inherited it from her husband, Seibel Memo., p. 33. Putting aside the factual differences between that and his case, Seibel also fails to mention, however, that Mrs. Curran was 80 years old at time she received her probationary sentence and highly unlikely to have any future earnings. *United States* v. *Curran*, 12-cr-80206 (SD Fla), *see* Document # 33, at p. 2 of 118.

Honorable William H. Pauley, III
August 12, 2016
Page 12

median age is that most people do not get involved tax offenses in their mid-twenties.  Yet, Rowen Seibel did, and he has pleaded guilty to doing so.  He was not an unsophisticated minor who unknowingly flew to Switzerland to open up a secret Swiss bank account.  Unlike some other defendants this Court sentences on a regular basis, the defendant did not suffer physical or emotional trauma growing up, there is no evidence of any undue influence from his mother and his conduct spanned a five-year period, which was capped off with his use of a Panamanian shell company to continue to hide his money.

As such, Rowen Seibel's age (at the time of his crime and now), is an important factor for the Court to consider when sentencing Seibel because there is a well-known inverse relationship between age and recidivism often cited by *the defense*, but not here because it works the other way:   the older an offender is, the less likely they are likely to be a repeat offender.

Furthermore, even at 23, despite his attempts to portray himself as such in his sentencing memorandum, Seibel was no naïf led astray by his mother.  In fact, by the time Seibel first became involved in this crime in 2004, not only did he have a business degree from the well-regarded NYU Sloan School of Business under his belt, the very next year, 2005, Seibel had intelligence and motivation to start his own business, R Squared Global (for which he is President and sole shareholder) and negotiate a licensing agreement with the owners of Serendipity 3, a famous New York City restaurant known (and adored) for its array of opulent ice cream dishes.  That licensing agreement granted to Seibel's new company, R Squared Global, the exclusive right to open Serendipity 3 restaurants anywhere in the world (except in New York and Nassau Counties) and sell merchandise bearing Serendipity 3's intellectual property. *R Squared Global, Inc.* v. *Serendipity 3, Inc.*, 2011 WL 5244691 (Nov. 3, 2011, SDNY PKC), at *1; *see also, R Squared Global, Inc.* v. *Serendipity 3, Inc.* Docket, 11-cv-7155 (SDNY)(Document 1, p. 8, Verified Complaint, ¶ 3; Document 6-1, License Agreement).

Pursuant to this Agreement, Seibel opened his first restaurant using the Serendipity 3 name in November 2008.  *Id.* at ¶¶ 30-34. Seibel opened his second restaurant using the Serendipity 3 theme in April 2009, at Caesars Palace, Las Vegas. *Id.* at ¶¶ 26-29 and his third restaurant in Georgetown, Washington D.C., in May 2011. *Id.* at ¶¶ 47-53.In just two and one half years of operation, the defendant's Caesars Serendipity 3 Restaurant had generated $20 million in gross sales. *R Squared Global, Inc.* v. *Serendipity 3, Inc.* Docket, 11-cv-7155 (SDNY)(Document 7, "Second Affidavit of Rowen Seibel" at  ¶ 3).

Honorable William H. Pauley, III
August 12, 2016
Page 13

Furthermore, it is important to realize that this was not a crime that just took place in 2004. Rather, as the description of the offense conduct above makes clear, Seibel's entire offense conduct was continuous and also involved: (1) his periodically monitoring and adjusting the investments in the UBS account (generating the 28 percent increase in principal by 2008); (2) his actions in 2008 where he quickly closed out the UBS account following news reports about the banker Bradley Birkenfeld who had been involved with the opening of his UBS account; (3) his action in 2008, where he failed to include any of the UBS income on his personal tax return and failed to report his interest in the UBS account or file an FBar report (PSR ¶ 13); (4) his failure in 2009 to include the same on his 2008 tax return or file an FBar report (PSR ¶ 14); and finally, (5) his October 2009 submission of the false Voluntary Disclosure Statement.

Importantly, this was the same period that overlapped with Seibel's sophisticated business arrangements regarding Serendipity 3, for which he had continuous legal representation from R Squared Global's legal counsel, the Certilman Balin Adler & Hyman, LLP law firm ("Certilman Balin"). In fact, so close has Seibel worked with that firm starting in 2004 and 2005, that two partners (Brian Ziegler and Paul Sweeney), a senior counsel (Morton Certilman) and a legal assistant (Barbara Hagan) from that firm all submitted letters on his behalf as attached to his sentencing memorandum. Seibel Memo., Exhs. 10, 11, 43 & 44, respectively. Attorney Ziegler tells how he started working with Seibel in 2004 and 2005 – the same time Seibel was flying over to Switzerland to open up his UBS account. Yet, these were not the only attorneys Seibel had access to during that time, he also submitted a letter from attorney Robert Olshever, Seibel Memo., Exh. 22, who relates that he has represented the Seibel family for thirty years. At no time did the defendant disclose to these attorneys that he was engaged in the conduct for which he pled guilty.

Moreover, there is another aspect to the need for specific deterrence in this particular case, and that is the nature of Seibel's very sophisticated business ventures, involving restaurants and complex and sophisticated agreements, all of which could provide opportunities for someone to engage in tax fraud. Unlike the vast majority of taxpayers who have their income taxes automatically withheld from their paychecks, payment of Seibel's personal and business tax obligations depends upon his voluntary compliance with the tax laws *each and every year*. Additionally, another factor for consideration is the location of his businesses, not only in Las Vegas, but also in international locations. All of these facts mean that

Honorable William H. Pauley, III
August 12, 2016
Page 14

there is a need to specifically deter Seibel from engaging in tax crimes in the future.

## C. **General Deterrence**

Federal income tax evasion related crimes, such as the crime Seibel has pleaded guilty to, hold a unique position in the federal criminal justice scheme in that they are crimes that victimize *all* law abiding United States taxpayers by depriving all of "lawfully-imposed taxes vital to the functioning of the United States." *In Re: Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339, 350 (2d Cir. 2013). Yet, at the same time, these are all people who could be in a position themselves, *every year*, to commit such a crime.

Despite the many potential violators of federal tax laws, the Government brings only a small number of criminal tax cases each year. For example, according to the United States Sentencing Commission records, of the 70, 877 federal offenders sentenced in Fiscal Year 2015, only 561 were sentenced for tax offenses. *See,* Table 6, Exh. D.

Because there are so few tax prosecutions, each sentence for a tax crime can have a disproportionate effective upon general deterrence – good or bad. Knowledge that an offender is justly sentenced to the applicable term of imprisonment promotes deterrence; but knowledge that an offender avoids an otherwise applicable sentence of imprisonment can be counter-productive and instill contempt for compliance in others.

This is why the concept of general deterrence as a sentencing factor is vitally important in all tax cases and even more important in cases like this -- those cases involving the hard-to-detect conduct: offshore tax evasion. The Sentencing Guidelines itself highlights the unique importance of general deterrence for all tax crimes right upfront in its introductory commentary to the tax guidelines:

Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws *is a primary consideration underlying these guidelines*. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

Honorable William H. Pauley, III
August 12, 2016
Page 15

USSG §2T1 (intro. comment.) (emphasis added).

This fundamental importance for general deterrence was reflected in a 2010 Southern District case involving another defendant who, like Seibel, had a secret account in Switzerland.  In sentencing that defendant -- who was 64 at the time of sentencing -- to a year and a day of imprisonment, Judge Gardephe stated:

> Our tax system is, at bottom, a voluntary one. Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct. I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment.

*United States* v. *Werdiger*, 10 Cr. 325 (PGG), Nov. 9, 2011 Tr. at 49-50 (relevant pages attached hereto at Exh. E).

Finally, the Government would point out that often when the prosecution speaks of the need for general deterrence, defendants will argue that general deterrence *in their case particular* should not influence the Court to impose a sentence of imprisonment because of very common and onerous collateral consequences that will befall upon their family, and, as here, business associates and employees.  Such arguments can be indeed appear powerful, because it is surely distressing to consider that admittedly innocent family and associates might suffer  from the loss of the day-to day presence of their loved one --  even the relatively modest period of imprisonment called for by the Guidelines in this case.

As such, often defendants will urge a Judge not to impose a sentence of imprisonment, not for their own benefit of course, but for the benefit of those innocents. Such arguments, however, fail to understand the single most powerful value of general deterrence is the fact that when there is robust general deterrence, there is a significantly better chance to end the vicious cycle of detrimental collateral consequences being inflicted upon innocent relatives and associate – of *future defendants – those who have not yet committed their crimes*.

Honorable William H. Pauley, III
August 12, 2016
Page 16

### III.  The Defendant's Arguments Do Not Support the Variance He Requests

#### A.  Defendant's Reliance Upon the PSR is Misplaced

The defendant urges this Court to rely upon the fact that the PSR included a recommendation for a sentence of time served.  Unfortunately, the PSR recommendation may have been influenced by two factual misunderstandings or misimpressions provided to Probation by the defense, both of which appeared for the first time only in the final PSR in footnotes 1 and 2 on page 7.

The first misunderstanding concerns the defendant's culpability for this crime.  The PSR states, "[a]ccording to *information provided by the defense*, although [Rowen] signed the [Voluntary Disclosure Application], *the Government does not assert that he read or reviewed the submission.*"  The footnote further mentions how Seibel's former attorney Stuart Smith "attested that the statement was prepared based upon information provided by Yvette" and without any input from Seibel. PSR ¶ 16, n.1 (emphasis added).  The clear implication is that the defendant is less culpable because he did not read the Voluntary Disclosure form before signing and mailing it to the IRS and that his mother alone was responsible for the factual errors in that document.

This is an unusual way for the defense to provide reliable information to the Probation Department for inclusion in the PSR for this Court to read and rely upon. If, in fact, Seibel *had not actually read* the objectively false Voluntary Disclosure statement before he admittedly signed it and caused to be submitted to the IRS, "the defense" could have simply made a direct representation to the Probation Department (and to this Court) that "Rowen Seibel denies having read the Voluntary Disclosure statement before knowingly signing it and sending it off to the IRS."  But, the defendant made no such representation because Seibel almost certainly read the statement or intentionally chose not to do so.

In addition, even if Seibel did not read the Voluntary Disclosure document before signing it and mailing it off to the IRS, his culpability for this crime, the Corrupt Endeavor to Obstruct and Impede the Due Administration of the Internal Revenue Laws, in violation of Title 26, United States Code, § 7212, remains unchanged. This is so because Seibel knowingly and willfully affixed his signature to it and personally mailed it off to the IRS intending for the IRS to read and rely

Honorable William H. Pauley, III
August 12, 2016
Page 17

upon it; and that is what happened.  As such, this particular aspect of his
culpability would be the same even if he had not bothered to read such a clearly
important document before he mailed it to the IRS when it in fact contained false
information (whether he knew so or not); that conduct was sufficient to obstruct
the IRS.  He has pleaded guilty to obstructing the IRS; not making a false
statement.[10]

> The second misunderstanding and misimpression imparted to the Probation
Department by the defense is in the next footnote on page 7 of the PSR:

> > According to the defense, "this case did not reach a plea until this time
> > because the investigation was initially focused on Yvette Seibel, who funded
> > the account, not SEIBEL.  Seibel became the target of the
> > investigation at some point after the investigation had begun. Defense
> > counsel further informed that ultimately, Yvette Seibel "became too ill for
> > the Government to proceed against her."

PSR, p. 7, n.2.  The first sentence in that footnote is not accurate.  The delays
before "a plea" was reached herein was attributable in large part to requests by
Seibel's attorney for more time to try to resolve the matter pre-indictment.
Moreover, from the beginning of this investigation, Seibel, along with his mother,
was a focus of the investigation because, as Seibel's mother advised her attorney,
she met with Birkenfeld in 2004 to set up a "trust fund" *for Seibel*. *See,* Exh. A,
Smith Aff. ¶¶ 7-9.  That is why Smith filed an IRS Form 2848 for both Seibel and

---

[10]    Even were there a need to prove Seibel knew of the false content (and there is not), under
the law he is charged with knowledge of its contents.  As the Second Circuit has long stated:

> In general, individuals are charged with knowledge of the contents of documents they
> sign-that is, they have "constructive knowledge" of those contents.  In *Hayman*, for
> example, this Court held that one who asserts an innocent-spouse defense to tax evasion
> cannot claim ignorance of the contents of tax returns she signed: "Although Hayman
> claims to have signed the returns without reading them, she nevertheless is charged with
> constructive knowledge of their contents." *Hayman v. Commissioner*, 992 F.2d 1256,
> 1262 (2d Cir. 1993).

*Consolidated Edison Co. of New York, Inc.* v. *United States*, 221 F.3d 364, 371 (2d Cir. 2000).
(pursuant to the constructive knowledge standard, taxpayer's employee, and thus taxpayer, was
charged with knowledge of contents of ticket that employee signed following delivery of diesel
fuel to taxpayer's facility, regardless of whether employee actually read ticket).

Honorable William H. Pauley, III
August 12, 2016
Page 18

his mother in 2009, so that he could represent both in discussions with the IRS regarding this investigation. *Id.* (IRS Forms 2848, "Power of Attorney and Declaration of Representation,") (located after the Smith Aff.). While it was true that the Government ultimately elected not to proceed with the charges against the mother because of her incapacitation, information about her incapacitation was only provided to the Government *after* it had informed attorney Smith it intended to return charges against both. Thereafter, current counsel was retained.

### B.     The Defendant's Presence Is Not Needed For Caregiving

The defense urges this Court to impose a sentence that does not include imprisonment on Seibel because he is needed to care for his mother and his grandmother, who both have around-the-clock-care because of their respective conditions of dementia. Yet, the letters submitted by Seibel in support of his sentencing make clear the opposite, Seibel is not needed for their care; they each have their own around-the-clock-care givers and his wife lives with them and is available as Seibel's surrogate in his absence.

Moreover, those same letters make clear that Seibel already spends a considerable time away from New York tending to his business interests in Las Vegas where he maintains a $3 million home, PSR ¶ 56, and perhaps overseas in Paris. As such, he submitted numerous letters from residents of Nevada who professed to have gotten to know him intimately over the last few years, including employees of his restaurants, and business partners. All of which belies any claim that Seibel must be present all the time for the care of his mother or grandmother, who are indeed fortunate that Seibel, as a successful businessman can afford to pay for their care in his absence.

### C.     There is No Danger of Unwarranted Disparities

Referring to other prosecutions in which probation was imposed; Seibel asserts a lenient sentence is "required" to avoid unwarranted sentencing disparities. Seibel Memo., pp. 32-37. Even if it were appropriate to highlight only cases in which probation was imposed, while ignoring those instances in which terms of imprisonment were imposed, the defendant is not making an apples to apples comparison in the sentences he selected for this Court's attention. The defendant's situation is not the same as those cases in large part because they all involved significantly elderly individuals and many who only received probation following the filing of a Government 5K1.1 motion.

Honorable William H. Pauley, III
August 12, 2016
Page 19

As an initial matter, in his sentencing memorandum at pages 33-34, Seibel, seeks to justify a non-custodial sentence before Your Honor by reference to a *nolled* case (10-cr-1028). The defense asserts that because Seibel's culpability, they claim, is just the same as a person for whom the Government has since legally retracted all charges, this Court should grant him leniency.  This argument fails.  There is no need for the Court to determine or speculate why that matter did not proceed.  Unlike that other individual, Rowen Seibel *is guilty* of corruptly endeavoring to obstruct and impede the due administration of the Internal Revenue laws, in violation of Title 26, United States Code, Section 7212, and *has admitted his own guilt*.  Crediting the defense's argument about the other case and according mitigation to Seibel because of it, while permissible (since Your Honor's discretion herein is wide), is no more appropriate than permitting a jury to consider that there are other individuals the Government did not charge.

Additionally, at pages 35 to 36 of his sentencing memorandum, Seibel lists eleven cases in which probation was imposed and claims that because "a majority of other UBS clients who have already been sentenced … have received non-incarceratory sentences," Seibel, Memo. p. 38, Seibel too should receive such a sentence.  There is no such justification to do so in this case.

While, it might well be that many if not an actual majority of the UBS clients prosecuted for criminal tax violations have received probation sentences, Seibel, however, misleads the Court by implying those were all non-guideline sentences (*i.e.,* outside of the appropriate guideline range).  He provides no such evidence.

For example, looking just at the eleven cases he mentions, the majority were not non-guideline sentences of probation.  One, Olenicoff, according to records on that docket, had an Offense level of 4, with a guideline range of 0-6 months, so Olenicoff's probation sentence was in fact a sentence within his guideline range.  Next, according to documents on the public record, six of the eleven listed only received their probation sentences *after* the Government moved for downward departures under the Sentencing Guidelines pursuant to § 5K1.1 (Homann, McCarthy, Rubinstein, Zabzcuk, Abrahamsen, and Hoess).

This leaves just four of the eleven defendants to have received an actual non-guideline sentence (as Seibel seeks).  With respect to those four, it is hardly surprising that they were sentenced to probation when, based upon publicly filed

Honorable William H. Pauley, III
August 12, 2016
Page 20

documents which mention their ages or date of birth, their average age at the time they were sentenced was 78.5 years old (Wajsfelner, 84 years old, Zaltsberg, 76 years old, Robbins, 84 years old, and Warner, 70 years old).

Seibel also urges this Court to accord him mitigation because he had not been permitted to take advantage of the IRS's Voluntary Disclosure Program, *see supra herein,* "Rowen Seibel's Voluntary Disclosure Program Submission," wherein thousands of taxpayers who had secret foreign bank accounts like Seibel's, had been permitted to address their legal obligations civilly rather than criminally.  This Court should accord Seibel no such consideration.

Although Seibel learned of the IRS's investigation before the first Voluntary Disclosure program had been offered in March 2009, his actions in 2008 belie any claim of good faith on his part.  That is because in 2008, when he learned from news reports that the IRS was investigating UBS, and Bradley Birkenfeld in particular, rather than consulting one of the many attorneys then handling his business matters, he quickly emptied out his UBS account and transferred the funds into the other Swiss bank, using the Panamanian shell company Mirza. Additionally, and more importantly, even if the IRS had not already known about Seibel's UBS account by the time he submitted his Voluntary Disclosure application, it would have been rejected anyway because the program  permitted participation only if the  taxpayer made a *truthful* disclosure, not one like Seibel's, which contained materially false information. Accordingly, giving Seibel any consideration for making a false filing with the IRS would be an injustice.

Finally, early in his memorandum, Seibel urges this Court to take into consideration the collateral consequences a felony conviction might have upon his business interests and references Judge Frederick Block's recent decision in *United States* v. *Nesbeth*, explaining that Judge Block had imposed a sentence of just six months home detention in a case where the defendant had gone to trial and had faced a guideline range of 33-41 months.  Seibel Memo., p.3, at n.1.  That was not a case involving a foreign bank account, rather it involved a drug courier convicted after her boyfriend and his friends had involved her with bringing two suitcases of their drugs into this country.  Notably, in giving consideration to the collateral consequences to the defendant in that case, Judge Block pointedly distinguished that defendant from well-to-do and privileged defendants like Seibel, indicating that he was happy to take collateral consequences into consideration there because "it impact[ed] a poor, underprivileged defendant" and not privileged defendants

Honorable William H. Pauley, III
August 12, 2016
Page 21

like Seibel. *United States* v. *Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at
*8-9 (E.D.N.Y. May 24, 2016).  In any event, other than Seibel's speculation that a
felony conviction might interfere with his business interests because he is in the
restaurant business, there is no such evidence.  It was not a subject covered in the
PSR; nor did it appear to have been mentioned in any letters he submitted from the
numerous attorneys handling his business interests.

## IV.   <u>Conclusion</u>

For all the reasons set forth above, the Government respectfully submits that
a sentence within the stipulated guideline range, 12-18 months, is appropriate.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/s/_____
Robin W. Morey
Assistant United States Attorney
Telephone:  (212) 637-2196

Encl. (Exh. A-E)

cc:   Robert S. Fink, Esq. (via ECF; w/encl.)
Michael Sardar, Esq. (via ECF; w/encl.)